UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PENSKE TRUCK LEASING CO, LP,<br> *Plaintiff-Counter-Defendant*, | No. 3:18-cv-00735 (KAD) |
| v. | |
| SAFECO INSURANCE COMPANY OF ILLINOIS,<br> *Defendant-Counter-Claimant*, | |
| METROPOLITAN MESSENGER SERVICE LLC d/b/a AA METRO, CARMELO AGOSTO, PROGRESSIVE CASUALTY INS CO, JOSEPH BELBUSTI,<br> *Defendants.* | May 22, 2020 |

MEMORANDUM OF DECISION RE:
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 43, 45)

Kari A. Dooley, United States District Judge:

Penske Truck Leasing Co., L.P. ("Penske") filed this declaratory judgment action against Safeco Insurance Company of Illinois ("Safeco"), Joseph Belbusti ("Belbusti"), Metropolitan Messenger Service LLC d/b/a AA Metro ("AA Metro"), Carmelo Agosto ("Agosto"), and Progressive Casualty Insurance Company pursuant to 28 U.S.C. § 2201. Penske seeks a determination of the parties' rights and obligations under a truck rental agreement executed between Penske and AA Metro (the "Rental Agreement," ECF No. 1-2) in order to resolve claims asserted by Belbusti against Penske, Safeco, and Agosto in a pending state court action (the "underlying action"). Specifically, Penske seeks a declaratory judgment that, under the terms of the Rental Agreement, it owes Agosto and AA Metro $20,000 in liability coverage with regard to claims brought in the underlying action. (Compl. ¶ 26, ECF No. 1.) By counterclaim, Safeco seeks a declaratory judgment that Penske owes $750,000 in liability coverage to AA Metro and

1

Agosto with regard to the underlying action. (Safeco Counterclaim, ECF No. 20.) Penske and Safeco filed cross-motions for summary judgment in which they urge the Court to adopt their respective interpretations of the Rental Agreement, as well as oppositions and reply briefs. The Court heard oral argument on February 10, 2020. For the reasons that follow, the Court concludes that Penske is entitled to a declaratory judgment that it is obligated to provide $20,000 in liability coverage under the terms of the Rental Agreement. The Court accordingly GRANTS Penske's motion for summary judgment (ECF No. 45) and DENIES Safeco's motion for summary judgment (ECF No. 43).

**Background**

According to the allegations in the underlying action, Agosto rented a vehicle from Penske on December 4, 2014 through his employer, AA Metro. (Underlying Compl. Count One ¶ 1, ECF No. 1-1.) While driving the vehicle that same day, Agosto was involved in a motor vehicle accident in which he collided with the back of Belbusti's vehicle, resulting in serious injuries to Belbusti. (*Id*. Count One ¶¶ 2–5.) At the time of the accident Belbusti was insured by Safeco under a policy that included underinsured motorist coverage with bodily injury limits of $500,000 per person and $1,000,000 per accident. (*See* Joint Local Rule 56(a) Statement ¶¶ 15–17.)

The Rental Agreement required that liability insurance be maintained during the course of the rental and permitted customers to satisfy this requirement by acquiring coverage through Penske or by providing their own coverage. AA Metro elected the former option at a cost of $20 per day. (*See* Rental Agreement Cover Sheet.) As indicated, in dispute here is the amount of liability coverage owed to AA Metro and Agosto under the terms of the Rental Agreement, the determination of which will dictate at what point Safeco's underinsured motorist coverage is activated. The underlying action has been stayed pending the outcome of this case. *See* Order

Granting Motion to Stay, *Belbusti, Joseph v. Carmelo, Agosto et al*, No. AAN-CV16-6020087-S (Conn. Sup. Ct. Aug. 22, 2018).

**Standard of Review**

"Courts may properly address declaratory actions through a motion for summary judgment, which are subject to the same Rule 56(a) standard as any other motion for summary judgment." *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 657 (S.D.N.Y. 2015); *see also Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 444 (D. Conn. 2010).

This standard is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where, as here, "there are no disputed issues of fact and the only disputed issues are purely legal in nature," the entry of summary judgment is appropriate. *Kohlhagen v. Town of Wethersfield*, No. 3:10-CV-1295 (MRK), 2010 WL 3951917, at *2 (D. Conn. Oct. 7, 2010).

**Discussion**

The Court's determination is guided by the well-established principles of contract interpretation.

> A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.

3

*Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000) (quotation marks and citations omitted).[1]  "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Murtha v. City of Hartford*, 303 Conn. 1, 9, 35 A.3d 177 (2011) (citation omitted).  "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Poole v. City of Waterbury*, 266 Conn. 68, 88, 831 A.2d 211 (2003) (quoting *Niehaus v. Cowles Bus. Media, Inc.*, 263 Conn. 178, 188–89, 819 A.2d 765 (2003)).  Moreover, "[t]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id*. (quoting *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2000)).  "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous . . . . By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Id*. (quotation marks and citations omitted).

In dispute here is the meaning of the following language in the Rental Agreement regarding the provision of liability coverage when, as here, "Penske Provides Coverage:"

> If Customer elects Penske Liability Coverage, Penske agrees to provide liability protection for Customer and any Authorized Operator, and no others, subject to any limitations herein, *in accordance with the standard provisions of a basic automobile liability insurance policy* as required in the jurisdiction in which the Vehicle is operated, against liability for bodily injury, including death, and property damage arising from use of Vehicle as permitted by the Rental Agreement, *with limits as required by the state financial responsibility law or other applicable statute*.

---

[1] The Rental Agreement contains a choice of law provision stating that it "shall be governed by and construed in accordance with the substantive law of the State of Delaware." (Rental Agreement § VIII.F.) The parties' briefs cite Connecticut substantive law, however, and at oral argument they clarified their mutual understanding that there is no difference between the law of contractual interpretation in Connecticut and Delaware. The Court accordingly applies Connecticut substantive law.

(Rental Agreement § VI.B.1.(i) (emphases added).) The italicized portions of the contract provision are at the center of the parties' disagreement.

Relying on provisions of Connecticut law that required automobile drivers to have a minimum of $20,000 in coverage per person for liability against bodily injury at the time that the Rental Agreement was executed, Penske seeks a declaratory judgment that it owes only $20,000 in liability coverage in the underlying action. Safeco, on the other hand, relying on insurance regulations that are applicable to vehicles with a gross weight or gross combined weight of 18,001 or more pounds, seeks a declaratory judgment that Penske is required to provide $750,000 in liability coverage with respect to the underlying action. While Penske agrees that the gross weight or gross combined weight of the vehicle that Agosto and AA Metro rented from Penske is 25,999 lbs. (Joint Local Rule 56(a) Statement ¶ 13), it asserts that these regulations are not applicable under the terms of the Rental Agreement.

To ascertain the limits required by Connecticut's "financial responsibility law," Penske looks to the Connecticut regulation governing "Minimum provisions for bodily injury liability and property damage liability," which provides in relevant part that "[t]he limit of the insurer's liability shall not be less than the applicable limits for bodily injury and property damage liability specified in subsection (a) of section 14-112 of the general statutes." Conn. Agencies Regs. § 38a-334-5(e). Section 14-112, which is captioned "Proof of financial responsibility," provided at the time that the Rental Agreement was executed:

> To entitle any person to receive or retain a motor vehicle operator's license or a certificate of registration of any motor vehicle when, in the opinion of the commissioner, such person has a record on file with the commissioner which is sufficient, in the opinion of the commissioner, to require evidence of financial responsibility for the reasonable protection of other persons, *the commissioner shall require from such person proof of financial responsibility to satisfy any claim for damages by reason of personal injury to, or the death of, any one person, of twenty thousand dollars*, or by reason of personal injury to, or the death of, more than one person on account of any accident, of at least forty thousand dollars, and for damage to property of at least ten thousand dollars.

Conn. Gen. Stat. § 14-112(a) (effective to June 29, 2015) (emphasis added).[2] In other words, drivers operating in Connecticut must have, at a minimum, liability coverage equal to the limit specified in the State's financial responsibility statute, which, as set forth above, was $20,000 for personal injury for any one person, $40,000 for personal injury per incident, and $10,000 for property damage. Penske thus argues that it could not be clearer that the Rental Agreement's promise of a "basic automobile liability insurance policy" "with limits as required by [Connecticut's] financial responsibility law" guaranteed only twenty-thousand dollars against liability for per-person damages for bodily injury.

Safeco, on the other hand, maintains that the state regulations and statutes relied upon by Penske are not applicable and instead points to the Connecticut regulation that incorporates by reference the Federal Motor Carrier Safety Administration ("FMCSA") regulations governing "Minimum Levels of Financial Responsibility for Motor Carriers" at 49 C.F.R. Pt. 387. *See* Conn. Agencies Regs. § 14-163c-1(a)(6). These regulations apply to, *inter alia*, "for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce." 49 C.F.R. § 387.3(a). As relevant here, the regulations provide that "[n]o motor carrier shall operate a motor vehicle until the motor carrier has obtained and has in effect the minimum levels of financial responsibility as set forth in § 387.9 of this subpart." *Id.* § 387.7(a).[3] The minimum levels of financial responsibility are set at $750,000 for any for-hire carriage transporting nonhazardous property "[i]n interstate or foreign commerce, with a gross vehicle weight rating of 10,001 or more pounds." *Id.* § 387.9(1).

---

[2] The current version of the statute, which became effective January 1, 2018, raised these limits to 25/50/25.

[3] This regulation has been amended since the time that the Rental Agreement was executed but the relevant provision from the version in effect from February 17, 2009 to June 14, 2018 is identical to the current one.

Connecticut has adopted these regulations with respect to, *inter alia*, "[a]ny motor vehicle in intrastate commerce that has a gross vehicle weight rating, or gross combination weight rating, or gross vehicle weight or gross combination weight, of eighteen thousand one (18,001) or more pounds," and to "[a] person who holds a commercial driver's license or who operates any motor vehicle as described in subdivisions (1) to (5), inclusive, of this section," as well as to "[a] motor carrier as defined [in] 49 CFR Section 390.5, as amended from time to time, that is responsible for the operation of any motor vehicle or the driver thereof as provided in subdivisions (1) to (6), inclusive, of this section." Conn. Agencies Regs. § 14-163c-2(1), (6)-(7); *see also Martinez v. Empire Fire & Marine Ins. Co.*, 322 Conn. 47, 63, 139 A.3d 611 (2016) (explaining that "Connecticut has adopted regulations that generally mirror the federal regulations and that apply to motor carriers engaging in intrastate travel").

Both parties' arguments turn, in part, on whether the phrase "with limits as required by the state financial responsibility law or other applicable statute" is a qualifier of the phrase "basic automobile liability insurance policy." Penske argues that the contract is unambiguous that the "limits" required derive from those that attach to a "basic automobile liability" policy. Accordingly, Penske argues, the regulations regarding commercial trucks are not implicated by the Rental Agreement. Safeco asserts that the language regarding a basic automobile policy is merely a reference to the type of "coverage terms, definitions, conditions and exclusions" that are standard in such a policy and has no bearing on the limits of liability required under the Rental Agreement. (Safeco Mem. at 6, ECF No. 43-1.) Safeco further submits that the subsequent phrase requiring coverage "with limits as required by the state financial responsibility law or other applicable statute" identifies the appropriate dollar amount, and necessarily elicits the limits for commercial motor carriers. Otherwise, according to Safeco, the phrase regarding limits mandated

by the state financial responsibility law would be rendered surplusage. The Court agrees with Penske.

"[T]he last antecedent rule of contractual and statutory construction, . . . provides that qualifying phrases, absent a contrary intention, refer solely to the last antecedent in a sentence." *Connecticut Ins. Guar. Ass'n v. Drown*, 314 Conn. 161, 189, 101 A.3d 200 (2014) (quotation marks and citation omitted). If, however, "the limiting language is separated from the preceding noun or phrase by a comma, in [that] case 'one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it.'" *Karas v. Liberty Ins. Corp.*, No. 20149, 2019 WL 5955947, at *16 (Conn. Nov. 12, 2019) (quoting *State v. Rodriguez-Roman*, 297 Conn. 66, 76, 3 A.3d 783 (2010)). For example, in *Corsair Special Situations Fund, L.P. v. Engineered Framing Sys., Inc.*, 327 Conn. 467, 174 A.3d 791 (2018), the Connecticut Supreme Court interpreted the following phrase in a Connecticut statute governing the payment of fees for a marshal's service of post-judgment process:

> The following fees shall be allowed and paid . . . for the levy of an execution, when the money is actually collected and paid over, or the debt or a portion of the debt is secured by the officer, fifteen per cent on the amount of the execution, provided the minimum fee for such execution shall be thirty dollars.

*Id*. at 472 (quoting Conn. Gen. Stat. § 52-261(a)(F)). In applying the last antecedent rule, the court held that while the phrase "by the officer" modified the latter circumstance, where "the debt or a portion of the debt is secured," it did not qualify the former phrase addressing "when the money is actually collected and paid over." *Id*. at 475–76. Thus, the court declined to construe the statute as requiring that the marshal have personally collected and paid over the money in order for the marshal to be entitled to a fee. *See id*. at 477. As the court explained, "had the legislature intended for 'by the officer' to apply to the first condition as well, it could have expressed such an intention more clearly by inserting a comma between the second condition and that phrase (when the money

is actually collected and paid over, or the debt or a portion of the debt is secured, by the officer)."

*Id*. at 476.

> Here, the relevant language provides in full:
>
> If Customer elects Penske Liability Coverage, Penske agrees to provide liability protection for Customer and any Authorized Operator, and no others, subject to any limitations herein, in accordance with the standard provisions of a basic automobile liability insurance policy as required in the jurisdiction in which the Vehicle is operated, against liability for bodily injury, including death, and property damage arising from use of Vehicle as permitted by the Rental Agreement, with limits as required by the state financial responsibility law or other applicable statute.

(Rental Agreement § VI.B.1.(i).)  The Rental Agreement presents the inverse situation from that which necessitated the result in *Corsair*. Contrary to the statutory language in *Corsair*, the punctuation here parses the contractual language in a manner indicating that the qualifying language *does* apply to each of the previous antecedent parts. Specifically, the phrase "with limits as required by the state financial responsibility law or other applicable statute" is separated by a comma from its immediate antecedent, "against liability for bodily injury, including death, and property damage arising from use of Vehicle as permitted by the Rental Agreement," which in turn qualifies the previous antecedent, "in accordance with the standard provisions of a basic automobile liability insurance policy as required in the jurisdiction in which the Vehicle is operated."  Because each of these phrases is separated by a comma, the "limits" required under the state's financial responsibility law are those that flow from the "provisions" of basic automobile liability insurance.  Had the drafters intended for the required insurance limits to be defined separately from the parameters of a basic automobile insurance policy, they would not have preceded the "limits" phrase by a comma.  *See Karas*, 2019 WL 5955947, at *16 (If "the limiting language is separated from the preceding noun or phrase by a comma, in [that] case one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it.") (quotation marks and citation omitted).

Safeco urges a different conclusion relying first on the Rental Agreement's alternate coverage option whereby a customer can provide its own coverage instead of purchasing insurance through Penske. The relevant language provides:

> If Customer elects to provide its own coverage, Customer shall, at its sole cost, provide liability coverage for Customer and Penske, and their respective agents, servants, contractors and employees, in accordance with the standard provisions of a basic automobile liability insurance policy as required in the jurisdiction in which Vehicle is operated, against liability for bodily injury, including death, and property damage arising out of ownership, maintenance, use and operation of Vehicle with limits of a combined single limit of at least $1,000,000 per occurrence.

(Rental Agreement § VI.B.1(ii).) Safeco emphasizes that the contract in this case requires "limits of a combined single limit of at least $1,000,000 per occurrence," despite containing the same prefatory phrase regarding "the standard provisions of a basic automobile liability insurance policy" that Penske argues is controlling here. This provision supports Safeco's interpretation to the extent that it reflects that the Rental Agreement distinguishes between insurance "provisions" and "limits," as a basic automobile insurance policy obviously does not necessitate a combined single $1,000,000 limit per occurrence. However, application of the last antecedent rule to this provision of the contract supports rather than defeats the Court's conclusion. In this section, the phrase "with limits of a combined single limit of at least $1,000,000 per occurrence" is *not* separated from its antecedent phrase by a comma and therefore qualifies only the immediate antecedent "against liability for bodily injury, including death, and property damage arising out of ownership, maintenance, use and operation of Vehicle." Accordingly, the phrase "basic automobile liability insurance policy" is not tethered to the provision regarding limits as it is in the section where "Penske Provides Coverage."

Safeco further argues that it is absurd for Penske to suggest that customers have the option on the one hand of providing their own coverage with a mandatory $1 million limit per occurrence, or to elect Penske's policy on the other, in which case their coverage is confined to only $20,000

10

per person or $40,000 per occurrence. Safeco argues that imputing a $750,000 coverage requirement to the commercial vehicle rented to AA Metro is the only reasonable way to synthesize these two different coverage options. The Court is not persuaded. The scope of the coverage contemplated in the two provisions is vastly different. First, when Penske provides coverage, it agrees to do so "for Customer and any Authorized Operator, and no others." (Rental Agreement § VI.B.1.(i).) When the customer provides coverage, on the other hand, the customer is required to name Penske as an insured. (*Id*. § VI.B.1.(ii).) Second, Penske's coverage provides protection against liability "arising from use of Vehicle as permitted by the Rental Agreement," whereas the customer must provide coverage against liability "arising out of ownership, maintenance, use and operation of Vehicle." (*Id.* § VI.B.1.(i)-(ii).) The $1 million, therefore, encompasses protection not only for the Customer but also for Penske and not only against liability arising from the use of the vehicle but also ownership and maintenance. *Cf. Nat'l Indem. Co. v. Nat'l Union Fire Ins. Co*., 837 F. Supp. 117, 120 (D. Md. 1993) (rejecting interpretation of insurance contract that would have conferred $1 million in liability coverage on Penske lessees, "over whom neither [Penske's insurer] nor Penske could exercise control," and observing "[i]t is not surprising that an insurance company would distinguish between two identifiable risk pools and offer a lower level of coverage for (or demand a higher premium from) the riskier group").

Even if the last antecedent rule did not inform the result, the Court concludes that it would be unreasonable to read the insurance requirements for commercial motor carriers into a contract that promised liability protection "in accordance with the standard provisions of a basic automobile liability insurance policy," when the phrase "commercial vehicle" does not appear anywhere in

the text of the Rental Agreement.[4] *See, e.g.*, *State v. Phillip Morris, Inc.*, 279 Conn. 785, 805, 905 A.2d 42 (2006) ("[T]his court will not construe [a] contract's language in [a] manner that 'would lead to a patently absurd and inequitable result'") (quoting *Waesche v. Redevelopment Agency*, 155 Conn. 44, 51, 229 A.2d 352 (1967)).

Moreover, to construe the Rental Agreement as incorporating the federal motor carrier regulations (as adopted under Connecticut law) absent express language to that effect makes little sense, as a policy matter. To start, Penske is not a motor carrier within the meaning of the FMCSA and therefore has no obligations thereunder.[5] Nonetheless, Safeco argues that if Penske's "Customer" or "Authorized Operator" was a motor carrier, Penske was obligated to provide the coverage that the customer or authorized operator was required to maintain under the applicable regulations. Safeco contends that because Penske knew that the vehicle it rented to AA Metro exceeded 18,001 pounds, Penske was bound to deliver the level of protection that AA Metro needed to procure to maintain the latter's compliance with the FMCSA. Again, the Court disagrees.

Safeco would ask this Court to impose, essentially, insurance underwriting obligations on Penske with respect to each of its customers before renting a truck so that the appropriate (though varying) levels of insurance are procured under the "Penske Provides Coverage" provision. Penske is not in the insurance underwriting business and this is an unreasonable interpretation of

---

[4] The coverage provision appears under the heading "Commercial Rental," but "commercial" is not defined in any way that references commercial vehicles or motor carriers. Instead, the Rental Agreement distinguishes between a "Household Rental," which refers to "the rental of a Vehicle to be used in the movement of household goods owned by Customer, or members of Customer's immediate family, for which Customer is not compensated for moving," and a "Commercial Rental," which is defined as "the rental of a Vehicle for the movement of (a) commercial or business goods that are not personal in nature; or (b) goods owned by someone other than Customer for which Customer is to be compensated for moving." (Rental Agreement § I.A.2–3.)

[5] Motor carrier is defined therein as "a for-hire motor carrier or a private motor carrier," with for-hire carriage defined as "the business of transporting, for compensation, the goods or property of another." 49 C.F.R. § 387.5. A "private motor carrier" is defined in a separate regulation that was enacted after the Rental Agreement's execution as "a person who provides transportation of property or passengers, by commercial motor vehicle, and is not a for-hire motor carrier." *Id.* § 390.5T.

the contract provision at issue. While Safeco argues that the limits set by the FMCSA regulations are "for the benefit of the citizens of the State of Connecticut, based on the judgment of our government," which "Penske should not be able to avoid . . . by slight of hand" (Safeco Opp. at 5, ECF No. 49), these were AA Metro's obligations, not Penske's, and the Court cannot rewrite the parties' agreement to conform to a regulation that is not incorporated either explicitly or implicitly into the Rental Agreement. "It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree." *Connecticut Ins. Guar. Ass'n v. State*, 278 Conn. 77, 84–85, 896 A.2d 747 (2006) (quoting *Holly Hill Holdings v. Lowman*, 226 Conn. 748, 755, 628 A.2d 1298 (1993)); *see also Tjong v. Penske Truck Leasing Co., L.P.*, 2006 WL 1574079, at *2 (N.J. Super. Ct. App. Div. June 9, 2006) (holding, in case involving similar rental agreement provision that explicitly set forth the applicable state limits, that "[a] provision in a rental contract that clearly limits the self-insurance obligation of the rental company is enforceable when the rental agreement provides for the statutory minimums.").

The Court finds instructive a decision by the Fifth Circuit interpreting a different FMCSA regulation. In *Illinois Cent. R. Co. v. Dupont*, 326 F.3d 665 (5th Cir. 2003), the Fifth Circuit was asked to decide whether a liability insurer was required to include a special endorsement known as the "MCS-90 endorsement" in its policy, which would render the insured liable to third parties for its insured's negligent use of any motor vehicle, even if the vehicle is not named in the insurance policy. *Id.* at 666–67. The court ultimately did not decide whether the MCS-90 endorsement was applicable to the accident in question but nonetheless held that the plaintiff could not achieve a reformation of the insurance policy in any event, as the FMCSA regulations that imposed the MCS-90 endorsement "are directed at the motor carrier, not its insurer." *Id*. at 668. Therefore, the court did not read the FMCSA "as imposing a duty on the insurer to make sure that non-exempt motor carriers secure the required insurance." *Id.* at 669 & n.8 (citing 49 C.F.R. §

13

387.1.)  In rejecting a public policy argument that would favor such a duty, the court "question[ed] the fairness of placing a duty on insurance companies to determine whether an insured is a motor carrier for hire, who engages in the interstate shipment of non-exempt goods, using non-exempt vehicles, and is otherwise subject to the Motor Carrier Act and its complex regulations," when "[t]he motor carrier is in the best position to know the nature of its business and the legal requirements for conducting that business."  *Id.*  So too is Penske's customer and not Penske in the best position of knowing whether it is subject to the FMCSA and ensuring compliance with its regulatory framework.

**Conclusion**

For the foregoing reasons, Penske is entitled to a declaratory judgment that its coverage obligation is limited to $20,000 per person as was required pursuant to Conn. Gen. Stat. § 14-112(a) under the plain and unambiguous language of the Rental Agreement.  Penske's motion for summary judgment is accordingly granted and Safeco's motion for summary judgment is denied.

A separate judgment shall enter.  The Clerk of the Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 22nd day of May 2020.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE